Slip Op. 18-37

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEVERSTAL EXPORT GMBH, and SEVERSTAL EXPORT MIAMI CORPORATION, | |
| Plaintiffs, | Before: Jane A. Restani, Judge |
| v. | Court No. 18-00057 |
| UNITED STATES OF AMERICA, UNITED STATES CUSTOMS AND BORDER PROTECTION, ACTING COMMISSIONER KEVIN K. MCALEENAN, DEPARTMENT OF COMMERCE, SECRETARY WILBUR ROSS, and PRESIDENT DONALD J. TRUMP, | PUBLIC VERSION |
| Defendants. | |

## <u>OPINION</u>

[Motion for preliminary injunction denied]

Dated: April 5, 2018

    <u>Mark Lunn</u>, Thompson Hine LLP, of Washington, DC, argued for Plaintiffs Severstal Export GmbH and Severstal Export Miami Corp.  With him on the brief were <u>David Wilson</u> and <u>Sarah Hall</u>, Thompson Hine LLP, of Washington, DC.

    <u>Tara Hogan</u>, Commerical Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendants.  With her on the brief were <u>Joshua Kurland</u> and <u>Stephen Tosini</u>, Commerical Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC.

    **Restani, Judge:**  Severstal Export GMBH ("Severstal Export") and Severstal Export Miami Corporation ("Severstal Miami") (collectively, "plaintiffs") seek to enjoin the enforcement of Presidential Proclamation No. 9705, as subsequently amended.  Proclamation No. 9705, 83 Fed. Reg.

11,625 (Mar. 8, 2018); Proclamation No. 9711, 83 Fed. Reg. 13,361 (Mar. 22, 2018) (collectively, the "Steel Tariff").

## BACKGROUND

On April 19, 2017, the Secretary of Commerce opened an investigation into the impact of steel imports on U.S. national security.   OFFICE OF TECH. EVALUATION, U.S. DEP'T OF COMMERCE, THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY:  AN INVESTIGATION CONDUCTED UNDER SECTION OF THE TRADE EXPANSION ACT OF 1962, AS AMENDED, at 18 (Jan. 11, 2018) ("Steel Report").   After notifying the Secretary of Defense, id. at App'x A, the investigation was conducted and the U.S. Department of Commerce ("Commerce") issued its report on January 11, 2018, see generally id.

The Steel Report stated that: (A) "Steel is Important to U.S. National Security," (B) "Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry," (C) "Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening our Internal Economy," and (D) "Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy." Steel Report at 2–5.   The report recommended a range of alternative actions, including global tariffs, each of which had the objective of maintaining 80 percent capacity utilization for the U.S. steel industry.   Steel Report at 58–61.   In response to the Secretary of Commerce's report, however, the Secretary of Defense indicated an absence of any steel-related threat to national military supply chains:  "[T]he U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, [the U.S. Department of Defense ("DoD")] does not believe that the findings in the reports impact the ability of DoD programs to

acquire the steel or aluminum necessary to meet national defense requirements."  Memorandum

in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction,

ECF No. 16, at Ex. D.  The Secretary of Defense further indicated his "concern[] about the

negative impact on our key allies regarding the recommended options within the reports . . .

among these reports' alternatives, targeted tariffs are more preferable than a global quota or

global tariff."  Id.

Proclamation No. 9705 was issued on March 8, 2018.  Invoking Commerce's Steel

Report and the authority granted by 19 U.S.C. § 1862 to enact trade measures to counter import-

related threats to national security, the proclamation imposed a 25 percent ad valorem tariff on

steel imports from every country except Canada and Mexico, effective March 23, 2018.

Proclamation No. 9705, 83 Fed. Reg. at 11,625 and 11,627.  The original proclamation also

provided that:

> Any country with which we have a security relationship is welcome to discuss
> with the United States alternative ways to address the threatened impairment of
> the national security caused by imports from that country.  Should the United
> States and any such country arrive at a satisfactory alternative means to address
> the threat to the national security such that I determine that imports from that
> country no longer threaten to impair the national security, I may remove or
> modify the restriction on steel articles imports from that country and, if necessary,
> make any corresponding adjustments to the tariff as it applies to other countries as
> our national security interests require.

Id. at 11,627.  No formal procedure or standards were ever promulgated for making such

changes,[1] but Proclamation No. 9705 was nevertheless amended on March 22, 2018, to extend

---

[1] On March 19, 2018, Commerce issued instructions on how to request exemptions for steel
articles "not produced in the United States in a sufficient and reasonably available amount or of a
satisfactory quality," as well as exclusions "based upon specific national security
(continued . . . )

**PUBLIC VERSION**

Court No. 18-00057                                                                                          Page 4

additional exemptions to Australia, Argentina, Brazil, the member countries of the European

Union, and South Korea.  Proclamation No. 9711, 83 Fed. Reg. at 13,363.  All exemptions were

furthermore made temporary, lasting until May 1, 2018.  Id. at 13,363–64.  With these

modifications, the Steel Tariff was implemented as scheduled on March 23, 2018.  Proclamation

No. 9711 continued to allow for nation-to-nation negotiations on exemptions and adjustments.

Id.  South Korea's temporary exemption was ultimately made permanent, in exchange for an

agreement which, inter alia, limited South Korean steel imports to 70 percent of South Korea's

average steel exports to the U.S. over the period from 2015 to 2017.  South Korean Ministry of

Trade, Energy and Industry, Korea, US reach agreement on trade deal and steel tariff exemption

(Mar. 26, 2018), available at english.motie.go.kr/en/ (last visited Mar. 27, 2018).

> Severstal Export is a Swiss company that negotiates and arranges sales of steel products

with foreign customers.  Pl. Br. at Ex. A, ¶1, 4.  Severstal Miami is a Florida corporation that

assists in negotiating sales and acts as Severstal Export's importer of record for steel products

entering the U.S.  Id. at Ex. B, ¶4.  Plaintiffs are both wholly-owned subsidiaries of a Russian

steel producer, PAO Severstal.  Id. at Ex. A, ¶1, 4.  The steel being imported by plaintiffs is shipped

from Russia and is thus subject to the 25 percent tariff levied by Proclamation No. 9705.  Pursuant to

---

considerations."  Requirements for Submissions Requesting Exclusions From the Remedies
Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and
Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to
Submitted Exclusion Requests for Steel and Aluminum, 83 Fed. Reg. 12,106, 12,107 (Dep't
Commerce Mar. 19, 2018) ("Exemption Regulations").  These regulations, however, apply only
to domestic parties, Proclamation No. 9705, 83 Fed. Reg. at 11,625, defined as "individuals or
organizations using steel articles identified in Proclamation 9705 in business activities (e.g.,
construction, manufacturing, or supplying steel to users) in the United States." Exemption
Regulations, 83 Fed. Reg. at 12,110.  The Federal Register notice announcing these regulations
indicated that country-wide exclusions were to be negotiated separately.  Id. at 12,108.

contracts entered prior to announcement of the Steel Tariff, plaintiffs expect to enter steel goods affected by Proclamation No. 9705 after March 23, 2018. Id. at Ex. A, ¶17. Plaintiffs challenge the lawfulness of Proclamation No. 9705, as applied to plaintiffs' expected steel imports, and seek a preliminary injunction to prevent the government from collecting the additional 25 percent tariff pending a decision on the merits of its action.[2]

## JURISDICTION

The court has jurisdiction of any justiciable claim raised by plaintiff under 28 U.S.C. § 1581(i)(2), which grants the Court of International Trade ("CIT") "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue[.]" This is a civil action commenced against the United States, challenging the government's imposition of tariffs under 19 U.S.C. § 1862 for reasons of national security.[3] Cf. Motion Systems Corp. v. Bush, 437 F.3d 1356, 1357 and 1362

---

[2] Although plaintiffs' initial filing sought a temporary restraining order, Pl. Br. at 1, it was agreed during a telephone conference that, as plaintiffs' goods had yet to enter the United States, the court would afford the government an opportunity to respond by March 28, 2018, hold a hearing on March 29, 2018, and thereafter issue an opinion as to the propriety of a preliminary injunction. Teleconference held on 3/23/2018 at 11:00 a.m., ECF No. 9.

[3] To the extent the government asserts that plaintiffs have no standing because 28 U.S.C. § 2631(i) limits standing to persons "adversely affected or aggrieved by agency action within the meaning of section 702 of title 5," see Def. Br. at 15 (citing 28 U.S.C. § 2631(i)) (emphasis added), while jurisdiction over the matters set forth in 28 U.S.C. § 1581 is exclusive to the CIT, the statutory standing provision is not so expressly limited. Further, at the time 28 U.S.C. § 2631 was passed in 1980, the broad wording of 5 U.S.C. § 702 had not been narrowed by Franklin v. Massachusetts. See 505 U.S. 788, 796 (1992). The court must conclude that, whatever narrow right of action exists for review of a Presidential Proclamation on tariffs under 28 U.S.C. § 1581(i), standing to assert such a right is not limited by the term "agency" action in 28 U.S.C. § 2631(i). Otherwise, while standing would only exist in the District Court, jurisdiction for the

(continued . . . )

**PUBLIC VERSION**
Court No. 18-00057                                                                                     Page 6

(Fed. Cir. 2006) (on appeal of denial of claim against the President and U.S. Trade Representative

under 19 U.S.C. § 2451, instead of reversing or remanding with a direction to dismiss for lack of

subject matter jurisdiction, the Federal Circuit affirmed the CIT's judgment in favor of defendants).

Elsewhere, however, the Federal Circuit has held that 28 U.S.C. § 1581(i) does not authorize

proceedings directly against the President. Corus Group PLC v. Int'l Trade Comm'n, 352 F.3d 1351,

1359 (Fed. Cir. 2003) ("Corus Group v. ITC"). Nonetheless, the United States remains a defendant

as do any other relevant officers or employees in their official capacities.

## DISCUSSION

The court employs a four factor test to determine whether a preliminary injunction should be

granted, considering: (1) whether plaintiffs will suffer irreparable harm absent the requested

relief; (2) plaintiffs' likelihood of success on the merits; (3) whether the balance of hardships

favors plaintiffs; and (4) whether the public interest would be served by granting the relief. Titan

Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1375–76 (Fed. Cir. 2009). "[N]o one

factor, taken individually, is necessarily dispositive, because the weakness of the showing

regarding one factor may be overborne by the strength of the others." Ugine & ALZ Belg. v.

United States, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006) (internal quotation marks omitted).

Nevertheless, "[c]entral to the movant's burden are the likelihood of success and irreparable

harm factors." Qingdao Taifa Group Co., Ltd. v. United States, 581 F.3d 1375, 1378 (Fed. Cir.

2009). Having had the benefit of oral argument and submissions from plaintiffs and defendants,

---

action would only lie in the CIT. Congress would not have intended such an absurd result. Cf.
Humane Soc. Of U.S. v. Clinton, 236 F.3d 1320, 1328 (Fed. Cir. 2001) ("Unless the grant of
jurisdiction [under 28 U.S.C. § 1581] carries with it a coextensive waiver of sovereign immunity,
(continued . . . )

PUBLIC VERSION
Court No. 18-00057                                                                    Page 7

the court now will weigh these four factors.

## I.   Whether Plaintiffs will Suffer Irreparable Harm Absent a Preliminary Injunction

Irreparable harm constitutes potential harm that cannot be redressed by a legal or equitable remedy at the conclusion of the proceedings, so that a preliminary injunction is the only way of protecting the plaintiffs. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).  In evaluating irreparable harm, the court considers: "the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief." CannaKorp, Inc. v. United States, 234 F. Supp. 3d 1345, 1350 (Ct. Int'l Trade 2017).  "Of these three factors, 'immediacy [of the injury] and the inadequacy of future corrective relief' may be weighed more heavily than magnitude of harm."  Id. (alteration in original).

After Commerce's Steel Report was issued, plaintiffs halted all U.S. contract-making in the reasonable expectation of some tariff action targeting, inter alia, Russian steelmakers.  See Oral Argument at Morning Session, 40:32–41:03, Afternoon Session, 17:47–17:51, ECF No. 32, Severstal Export GmbH v. United States, No. 18-00057 (Ct. Int'l Trade Mar. 29, 2018) ("Oral Arg.").  See also Pl. Br. at Ex. A, ¶15, 22, Ex. B, ¶16.  Plaintiffs state that, should the Steel Tariff continue with exceptions granted for other significant steel-producing nations, plaintiffs will continue to suspend U.S. contracting.  See Oral Arg. at Morning Session, 52:00–52:17, Afternoon Session, 17:51–18:32.

Pursuant to contracts concluded prior to the issuance of Proclamation No. 9705, plaintiffs will soon be entering Russian-made steel into the United States.  Pl. Br. at Ex. A, ¶7, 17 (noting,

---

the Congressional grant would be a hollow act, with no significant consequences to the
(continued . . .)

**PUBLIC VERSION**
Court No. 18-00057                                                                     Page 8

at the time of plaintiffs' motion, [[                          ]][4] of steel en route to the United States

from St. Petersburg and [[                      ]] scheduled to ship soon).   Pursuant to the

Proclamation, as amended, plaintiffs' imports are prima facie subject to the 25 percent tariff.  <u>See</u>

Proclamation No. 9705, 83 Fed. Reg. at 11,627; Proclamation No. 9711, 83 Fed. Reg. at 13,363–

64.  Steel being shipped to the U.S. falls into two categories, [[                        ]]  is  under

contract with traders.   Oral Arg. at Morning Session, 56:06–56:43.   The traders, not plaintiffs,

will pay duties on those entries.   Oral Arg. at Morning Session, 22:18–23:28.   <u>See id.</u> at

Afternoon Session, 15:46–15:56.  [[           ]] of the steel, however, is under contract with end

users.  <u>Id.</u> at Morning Session, 56:06–56:43.  Plaintiffs' standard practice in contracting with end

users is to deliver the goods "duties paid," and under the original terms of the contracts in

question, plaintiffs were indeed responsible for paying tariffs on these imports.  <u>See</u> Pl. Br. at Ex.

B, ¶18; Oral Arg. at Morning Session, 24:51–25:30, Afternoon Session, 14:10–14:34.  As the

tariffs were announced after [[                          ]] these shipments were already on the

water, plaintiffs were able to renegotiate tariff payments with their customers, such that plaintiffs

anticipate a total tariff bill of about [[                    ]], to be paid by Severstal Miami as the

importer of record, of which about [[                  ]] will  subsequently  be  reimbursed  by

customers.   Oral Arg. at Morning Session, 47:20–48:54, 50:11–50:24, Pl. Ex. 3 (a spreadsheet

breaking down these figures); Pl. Br. at Ex. 1 (containing renegotiation correspondence between

Severstal Miami and certain U.S. customers).   For comparison, the total tariff bill <u>after</u>

reimbursement is expected to nearly [[      ]] Severstal Miami's annual budget.  <u>Compare</u> Pl.

---

sovereign, and no significant benefits to the sovereign's subjects.").

**CONFIDENTIAL INFORMATION OMITTED**

Br. at Ex. B ¶4, 17, <u>with</u> Oral Arg. at Morning Session, 47:30–48:54, 50:11–50:24.  As Severstal

Miami is unable to cover the increased cost on its own, it has obtained a loan from its parent

company, brokered through Severstal Export.  <u>See</u> Pl. Br. at Ex. B, ¶17; Oral Arg. at Morning

Session, 1:33:23–1:33:50.

      Plaintiffs first contend that, absent a preliminary injunction, once plaintiffs pay the tariffs,

no legal mechanism exists for them to seek return of the funds if it is later determined the tariffs

were unlawful.  Pl. Br. at 11.  Plaintiffs' contention is unfounded.  While the relevant statutory

authority may not spell out a clear procedure applicable to such refund requests, precedent

reveals that an aggrieved party may secure the refund of a tax or tariff ultimately found to be

unconstitutionally levied.  <u>See, e.g.</u>, <u>U.S. Shoe Corp. v. United States</u>, 114 F.3d 1564, 1577 (Fed.

Cir. 1997), <u>aff'd</u>, 523 U.S. 360 (1998).  <u>See also</u> Defendants' Motion to Dismiss and, in the

Alternative, Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction, ECF No. 30, at 36 ("Def. Br.") (agreeing to the same).

      The court will discuss the remainder of plaintiffs' alleged harms as current harm and

future harm.  Pl. Br. at 11–12.  Plaintiffs' January decision to suspend U.S. sales, in reasonable

anticipation of future tariffs, has resulted in current harm in the form of contracts foregone.

Nevertheless, to the extent contracts have already been foregone, this will not be redressed by a

preliminary injunction (or a favorable verdict at trial).  An injunction could alter the business

calculus to permit future contracts; however, the remedial value would be limited because, once

a customer has been identified, plaintiffs' sales process requires roughly 4 months.  <u>See</u> Pl. Br. at

Ex. A ¶6, Ex. B ¶8.  As success at trial would necessarily be uncertain, plaintiffs would likely

---

[4] Confidential information is indicated by double brackets.

have to again suspend contracting several months beforehand.   The court does not find the

opening of this brief window through a preliminary injunction to offer much additional relief,

especially considering that if plaintiffs miscalculate the window and ultimately lose at trial, their

customer relations stand to suffer further.

Plaintiffs further allege that, in anticipation of having to repay the loan from PAO

Severstal, negotiations regarding tariff splitting with end user customers have damaged those

customer relationships.   Pl. Br. at Ex. B, ¶18, 24.   Furthermore, plaintiffs argue that business

relationships with trader customers have been damaged vis-à-vis foreign steel producers from

countries currently exempted from the Steel Tariff, as the necessity of paying an additional tariff

to import plaintiffs' goods has soured traders' assessments of plaintiffs as potential suppliers.

Oral Arg. at Afternoon Session, 14:30–15:29.   These harms would be redressed, plaintiffs

contend, if the tariffs were withdrawn. Id. at 15:46–15:56.

The Federal Circuit has suggested that loss of customers may support an irreparable harm

finding.   Qingdao Taifa, 581 F.3d at 1381 ("[T]his court acknowledges the distinct probability

that Taifa will ultimately incur the charge or lose customers.   Thus, the trial court did not clearly

err in determining that Taifa would suffer immediate and irreparable harm without an

injunction").   The magnitude of the current damage to plaintiffs' customer base, however, is not

itself sufficient to constitute "irreparable harm" for preliminary injunction purposes.

As for future harm, there is a substantial likelihood that plaintiffs will ultimately have to

pay increased tariff duties once their goods have landed.   Because plaintiffs' goods are custom-

made, Pl. Br. at Ex. A, ¶11, the court finds it unlikely that plaintiffs could simply reroute the

shipments elsewhere to avoid the duties.   Even if this were feasible, the damage to plaintiffs'

U.S. customer relationships would only grow.  Regardless of whether Severstal Miami pays the

tariffs using money loaned by its parent company, it must still pay the tariffs, and is liable to its

parent company for the loan balance.  See Pl. Br. at Ex. B, ¶17.  The court thus finds the

impending tariff payments sufficiently certain to constitute harm, but notes that courts may

typically redress economic harms of this sort through the normal litigation process.  See 28

U.S.C. § 2643(a)(1) ("The Court of International Trade may enter a money judgment (1) for or

against the United States in any civil action commenced under section 1581 . . . .").

    Severstal Miami contends, however, that normal litigation will not redress its harm

because either the loan will bankrupt it, or a prolonged, tariff-induced contracting freeze will

extinguish its customer relationships and drive it out of business.  Pl. Br. at 11–12.  If Severstal

Miami is shuttered, this will cost two people their jobs.  Pl. Br. at Ex. B, ¶4.  Defendants contend

that the court must consider the resources of plaintiffs' parent company in assessing the

likelihood of Severstal Miami's closure.   In support, defendants cite an employment contract

case from the District Court of the District of Columbia.  Def. Br. at 37 (citing Econ. Research

Servs., Inc. v. Resolution Econ., LLC, 140 F. Supp. 3d 47 (D.D.C. 2015)).  The court, however,

does not find Econ. Research Servs. instructive.  There, the District Court based its holding on

both the financial strength of the plaintiff corporation itself, and its subsidiary relationship with a

global parent corporation.  Id. at 53.  In general, the parties relevant to an irreparable harm

determination are the plaintiffs themselves.   Including the resources of plaintiffs' parent

corporation in this assessment is akin to piercing the corporate veil.  As the Federal Circuit has

stated, "the corporate form is not to be lightly cast aside."  3D Sys., Inc. v. Aarotech Labs., Inc.,

160 F.3d 1373, 1380 (Fed. Cir. 1998).  Severstal Miami is a Florida corporation with annual

**PUBLIC VERSION**
Court No. 18-00057                                                                                      Page 12

revenue of [[                         ]] and a single U.S. office.  Pl. Br. at Ex. B ¶4, 17.  Assuming,

<u>arguendo</u>, that a parent corporation's resources may be relevant in assessing irreparable harm in

some cases, defendants nevertheless fail to provide evidence that PAO Severstal intends to incur

financial liabilities on the scale necessary to keep Severstal Miami open, and the court finds no

record evidence to command such an inference.[5]  Rather, that the parent company has not, for

several months, intervened so that Severstal Miami could resume U.S. contract solicitation,

raises serious doubts as to whether such intervention might be forthcoming.

Damage which supports a finding of irreparable harm cannot be speculative.  <u>See</u> <u>Zenith</u>

<u>Radio Corp. v. United States</u>, 710 F.2d 806, 809 (Fed. Cir. 1983).  Given the magnitude of the

tariff and the import-curbing purpose of measures taken under Section 1862, plaintiffs can

clearly expect a reduction in U.S. sales.  <u>See</u> Proclamation No. 9705, 83 Fed. Reg. at 11,626; 19

U.S.C. § 1862(c)(1)(A)(ii).  The question is, however, can plaintiffs reasonably expect a

significant enough reduction in U.S. sales, such that Severstal Miami will have to close its doors?

Plaintiffs estimate that the countries exempted by Proclamation No. 9711 account for over 60%

of steel imports to the United States for the year 2017.  Pl. Br. at 8 (citing calculations based on

U.S. Dep't of Commerce, Enforcement & Compliance Table: US Imports of Steel Mill Products

(last modified Mar. 7, 2018), <u>available at https://enforcement.trade.gov/</u> (last visited Mar. 26,

2018) ("Commerce Compliance Table")).  While the Steel Tariff is of an indefinite duration,

---

[5] Furthermore, even if Severstal Miami's parent corporation were willing to continue paying the two employees' salaries to keep Severstal's doors open, unless it were also willing to mitigate the tariff costs such that contracts can be delivered, the loss of customers could nevertheless be expected to cripple Severstal Miami's business.

**CONFIDENTIAL INFORMATION OMITTED**

Proclamation No. 9711 only granted exemptions to other states for roughly five weeks, until May

1, 2018.  Proclamation No. 9711, 83 Fed. Reg. at 13,363.  The Proclamation further provides:

"In the event that a satisfactory alternative means is reached such that [the President] decide[s] to

exclude on a long-term basis a particular country from the tariff proclaimed in Proclamation

9705, [the President] will also consider whether it is necessary and appropriate in light of our

national security interests to make any corresponding adjustments to the tariff . . . as it applies to

other countries."  Id. at 13,362.

    One such "alternative means" has apparently been arrived at for South Korean steel

imports, granting tariff exemptions in favor of an annual quota equaling roughly 73.9 percent of

Korea's 2017 steel imports.[6]  Overall, plaintiffs must compete on a substantially unequal footing

with both U.S. producers and the countries responsible for most U.S. steel imports.  The full

breadth of harm anticipated by Severstal Miami is not definite, but given the concrete action

already taken by the corporation to remove itself from the U.S. market in reaction to the

---

[6] South Korean steel imports accounted for roughly 10 percent of steel imports to the United States in 2017.  Under the most recent agreement, Korean imports are heretofore exempt from the tariff, but subject to quantity limitations set at 70 percent of the average imports for the past three years.  See South Korean Ministry of Trade, Energy and Industry, Korea, US reach agreement on trade deal and steel tariff exemption (Mar. 26, 2018), available at english.motie.go.kr/en/ (last visited Mar. 27, 2018).  Commerce's report to the President contained two alternatives of universal application:  a 24 percent tariff or a quota of 63 percent of 2017 import figures.  See Steel Report at 7.  According to Commerce's statistics, 70 percent of South Korea's 2017 figures would be 2,534,550.2.  Commerce Compliance Table (2017 Annual Total Quantity for Korea, multiplied by 0.7).  According to the same, 70 percent of the 2015 to 2017 average would be 2,678,977.23, or 73.9 percent of South Korea's 2017 figures.  Commerce Compliance Table (Average of the 2015–2017 Annual Total Quantities for Korea, multiplied by 0.7).  If, according to Commerce's recommendation, a 24 percent tariff achieves a limiting effect roughly equal to that of a 63 percent quantity limitation, then Korea's terms appear somewhat more advantageous than those currently applicable to plaintiffs' imports.

recommendations contained in Commerce's Steel Report, and continued after the promulgation of Proclamations No. 9705 and 9711, the court does not find it to be merely speculative.[7] All versions of the Steel Tariff have hewn close to global tariff levels recommended by Commerce, and have furthermore included significant exemptions for other countries, but not Russia. This is a close case, but the sum total of plaintiffs' harm, both current and future, which a preliminary injunction might redress exceeds the threshold necessary to constitute "irreparable harm."[8]

## II. Plaintiffs' Likelihood of Success on the Merits

Plaintiffs must demonstrate "at least a fair chance of success on the merits for a preliminary injunction to be appropriate." Qingdao Taifa, 581 F.3d at 1381 (internal quotation marks omitted). "[T]he greater the potential harm to the plaintiff, the lesser the burden on Plaintiffs to make the required showing of likelihood of success on the merits." Ugine & ALZ Belg., 452 F.3d at 1293 (internal quotation marks omitted).

---

[7] Defendants analogize this situation to that in Corus Group PLC v. Bush. Def. Br. at 38–39 (citing 217 F. Supp 2d 1347, 26 C.I.T. 937 (2002) ("Corus Group v. Bush")). Although the CIT's irreparable harm analysis was not discussed on appeal, see generally Corus Group v. ITC, 352 F.3d 1351, Severstal Miami's ongoing suspension of business activities is a critical distinction between this case and Corus' argument that sound business principles would require it to close its Bergen, Norway plant rather than operate at an anticipated tariff-induced loss. See Corus Group v. Bush, 217 F. Supp. 2d at 1354, 26 C.I.T. at 943. It remains true that "[e]very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," id., 217 F. Supp. 2d at 1355, 26 C.I.T. at 944, but unlike Corus Group v. Bush, which concerned anticipated revenue shortfalls that might force "closure at some future date," id., Severstal Miami has produced evidence of an ongoing loss critical enough to threaten its very existence. The harm under consideration in this case thus differs materially, in terms of magnitude and immediacy, from that under consideration in Corus Group v. Bush.

[8] A significant change in the nature or character of exemptions granted to other nations, as compared with the tariff terms applicable to plaintiffs, may strengthen or weaken plaintiffs' claims of irreparable harm.

**PUBLIC VERSION**

### A.  The Justiciability of the Challenged Actions

Plaintiffs raise a constitutional challenge to the actions of the executive branch under Section 1862.[9]  Plaintiffs concede that Section 1862 constitutes a constitutional delegation of authority.  See Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559–60 (1976) (holding a previous version of Section 1862, which did not include any legislative override, and was in other relevant respects the same as the current version, to be a constitutional delegation of authority).  See also Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 877, § 232, as amended by Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1993, § 127(d) (current version at 19 U.S.C. § 1862 (1988)).  Furthermore, plaintiffs do not challenge the procedure followed by Commerce and the President in enacting the Steel Tariff.  Oral Arg. at Afternoon Session, 13:00–13:06.  Instead, acknowledging that this court lacks the power to review the President's lawful exercise of discretion, see, e.g., Dalton v. Specter, 511 U.S. 462, 474 (1994); United States v. George S. Bush & Co., Inc., 310 U.S. 371, 380 (1940), plaintiffs argue that in proclaiming steel tariffs under Section 1862 the President seriously misapprehended, and thus exceeded, his statutory authority.  Oral Arg. at Afternoon Session, 9:15–9:38.

Defendants contend that plaintiffs' claim nevertheless is non-justiciable.  Def. Br. at 14–19.  As defendants observe, Def. Br. at 16, in this situation, "the President's findings of fact and the motivations for his action are not subject to review," Corus Group v. ITC, 352 F.3d at 1361.  Nonetheless, that a statute grants the President some discretionary decision-making authority

---

[9] Plaintiffs do not argue that the President's actions are reviewable under the standards of the Administrative Procedure Act.  See Franklin, 505 U.S. at 801.

does not automatically insulate all aspects of executive branch action taken under that statute from judicial review.  See Dalton, 511 U.S. at 474 (assuming "that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA").  Rather, "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute . . . or action outside delegated authority." Corus Group v. ITC, 352 F.3d at 1361 (quoting, with approval, from Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985)) (alteration in original).  Relevant to this case, therefore, where statutory language limits the President, the court may review the executive's actions for "clear misconstruction" of such limiting language.  See Corus Group v. ITC, 352 F.3d at 1359 ("The statute only gives the President authority to impose a duty if the Commission makes 'an affirmative finding regarding serious injury' . . . Therefore, the President's action was not discretionary, and the validity of the proclamation is dependent on whether three commissioners in fact found serious injury with respect to tin mill products.") (internal citations omitted).

As the Federal Circuit held in Corus Group v. ITC, this level of review is consistent with the Supreme Court's holdings in Franklin and Dalton.  Corus Group v. ITC, 352 F.3d at 1357–60 (citing Dalton, 511 U.S. at 469–70, 476; Franklin, 505 U.S. at 797–800).[10]  Defendants themselves implicitly recognize the distinction between reviewing the substance of an exercise of discretion and reviewing an action for clear misconstruction of the statute, so that the authority

---

[10] Unlike Dalton, wherein plaintiffs challenged the President's ability to act based upon procedural flaws attributable to the agencies which prepared prerequisite recommendations, 511 U.S. at 474, plaintiffs in this case allege substantive, rather than procedural flaws attributable to both the President and defendant agencies.

delegated by Congress is exceeded.  That is, defendants contend that the President's exercise of

discretion is unreviewable, and separately argue that the President acted in conformity with

Section 1862.  See Def. Br. at 16.  Accordingly, the court turns to the issue of the bounds of

Presidential authority under the relevant statute.[11]

### B.  Whether the President Exceeded his Authority under Section 1862

As a preliminary matter, defendants argue that, to the degree plaintiffs' claim is

justiciable, it is barred because plaintiffs have failed to exhaust administrative remedies.  Def. Br.

at 19–20.  See 28 U.S.C. § 2637(d) (in cases brought under 28 U.S.C. § 1581(i), exhaustion is

required where appropriate).  Specifically, they argue that defendants could have invoked the

administrative process promulgated by Commerce on March 19, 2018, to request a product-

specific exclusion from the Steel Tariff.  Id. (citing Exemption Regulations, 83 Fed. Reg. at

---

[11] Defendants likewise contend this dispute is not ripe, alleging it is not fit for judicial decision, and that resolution of this matter by the court would impose a greater hardship on defendants than deferral would impose upon plaintiffs.  Def. Br. at 20–21 (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977)).  The court is unpersuaded.  Contrary to defendants' suggestion, the Steel Tariff is not a matter of "case-by-case" application.  Def. Br. at 21 (citing Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 164 (1967)).  Rather, it is a tariff of broad application to which Commerce may grant limited exceptions following applications by aggrieved domestic parties.  See Proclamation No. 9705, 83 Fed. Reg. at 11,625; Exemption Regulations, 83 Fed. Reg. at 12,111–12.  Furthermore, as discussed above, the hardship imposed upon plaintiffs by delaying resolution of this matter is significant, far exceeding "mere uncertainty as to the validity of a legal rule," and outweighs any hardship wrought by defendants' inability to review an administrative exclusion request under the terms provided by 83 Fed. Reg 12,107 et seq.  Def. Br. at 21 (quoting Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 811 (2003)).  No such request has been filed by plaintiffs, Oral Arg. at Morning Session, 49:17–49:55, and as discussed below, whether plaintiffs themselves might be afforded such an exemption is irrelevant to whether the Steel Tariff was issued in contravention of the authority granted by Section 1862.  Defendants, therefore, would gain little, if anything, by reviewing such a request.  Accordingly, the court finds this matter ripe for judicial decision.

12,110–12).  Commerce's argument fails for two reasons.  First, as Commerce implies, see Def. Br. at 20, Severstal Export, as a foreign entity, is likely not eligible for relief under the regulation.  Second, plaintiffs are not arguing that their product should be excluded from the reach of the new tariffs because it "is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for a specific national security consideration."  83 Fed. Reg. at 12,110.  Rather, plaintiffs argue that the Steel Tariff itself is invalid, as it was promulgated in clear misapprehension of the President's statutory authority under Section 1862.  See Pl. Br. at 23.  To the degree it is available to plaintiffs, the aforementioned regulatory process is not an appropriate forum for adjudicating plaintiffs' specific claim.  Accordingly, no unexhausted administrative remedies bar consideration of plaintiffs' claim.

Plaintiffs argue that the President has misconstrued Section 1862 by over-reading what can constitute a threat to national security, in finding that steel imports currently represent such a threat.  Pl. Br. at 18–19.  Defendants appear to argue, on the other hand, that under Section 1862, as long as the President has received Commerce's report, the court can look no further.  Oral Arg. at Afternoon Session, 32:29–33:09.  See also Def. Br. at 16–17.  The report is certainly a precondition, see Fed. Energy, 426 U.S. at 559, albeit one not challenged in this case, but the relevant statutory language indicates that the following additional conditions exist.[12]  The

---

[12] Defendants rely upon Motion Systems in arguing that the court is precluded from reviewing the action challenged in this case.  See Def. Br. at 15–16.  Motion Systems concerned a challenge to Presidential action under 19 U.S.C. § 2451(k).  Motion Systems, 437 F.3d at 1359 (citing 19 U.S.C. § 2451 (since repealed)).  How instructive Motions Systems is in the light of Fed. Energy, 426 U.S. at 559, 571, which involved the same statute at issue here, and later

(continued . . . )

President is limited to "action . . . to adjust the imports of the article and its derivatives so that

such imports will not threaten to impair the national security."  19 U.S.C. § 1862(c)(1)(A)(ii).

See also Fed. Energy, 426 U.S. at 559 ("Moreover, the leeway that the statute gives the President

in deciding what action to take in the event the preconditions are fulfilled is far from unbounded.

The President can act only to the extent 'he deems necessary to adjust the imports of such article

and its derivatives so that such imports will not threaten to impair the national security.'"); id. at

571 ("[O]ur conclusion here . . . that  the imposition of a license fee is authorized by [§] 232(b)

in no way compels the further conclusion that [a]ny action the President might take, as long as it

has even a remote impact on imports, is also authorized.").

Plaintiffs do not argue that a tariff or quota on steel imports is not authorized by Section

1862 where a threat to the national security encompassing the entire U.S. steel industry has been

identified.   The court agrees that such import-targeting actions are exactly the sort of actions

authorized by Section 1862.  Plaintiffs instead argue that the Section 1862 Steel Tariff is being

used in trade negotiations to draw concessions from other countries unrelated to steel imports.

Pl. Br. at 17–18.  Such a mismatch – harm to domestic industry (A) threatens to impair national

security, import-restricting actions favoring domestic industry (A) are taken under Section 1862,

such restrictions are then lifted in exchange for concessions favoring unrelated domestic industry

(B) – would raise a credible question as to whether the President misapprehended the authority

granted by Section 1862.  See 19 U.S.C. § 1862(c)(1)(A)(ii) ("action . . . to adjust the imports of

---

Supreme Court cases need not be resolved for purposes of the present motion. To the extent the
court may review the action of the President, it is unlikely that the President has exceeded his
statutory authority.

the article and its derivatives") (emphasis added).  As support, plaintiffs quote a statement by the President indicating that "Tariffs on Steel and Aluminum will only come off if new & fair NAFTA agreement is signed."  Pl. Br. at 17–18.  But the NAFTA trading parties are high on the list of exporters of steel to the United States and plaintiffs have not demonstrated that the Steel Tariff has been lifted in favor of measures only, or even mostly, benefitting unrelated industries.[13]

The statute contains more specific limitations as follows:

[T]he Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements.  In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

---

[13] Likewise, the magnitude of the exemptions currently granted by Proclamation No. 9711, by itself, does not place the Steel Tariff outside the bounds of Section 1862.  See Pl. Br. at 17 n.12 (arguing these exemptions undercut the President's national security rationale).  These exemptions have been granted temporarily, and in a stated effort to negotiate alternative measures beneficial to the steel industry.  See Proclamation No. 9711, 83 Fed. Reg. at 13,362.  Furthermore, record evidence indicates the desirability of exceptions for certain "key allies."  Pl. Br. at Ex. D.

19 U.S.C. § 1862(d).  See also Fed. Energy, 426 U.S. at 559 ("232(c) [a]rticulates a series of

specific factors to be considered by the President in exercising his authority under [§] 232(b)."

(internal citations omitted)).  Regarding this limitation, plaintiffs argue that the aforementioned

statement regarding NAFTA, as well as related statements made in conjunction with a

Congressional campaign in Pennsylvania, reveal that the President's stated national security

motives were pretextual, and the President has clearly read Section 1862 as granting authority to

adopt tariffs for purely economic reasons, including to bolster his position in trade

renegotiations.  See Pl. Br. at 12–16.

The factors listed in Section 1862(d) are required, but not exclusive.  Commerce's Steel

Report refers to each of these factors.  Steel Report at 1 (recounting the factors generally), 23–

25. 47–49 (describing domestic production needed for national defense requirements, the

percentage of domestic capacity needed to cover national defense requirements, and overall

economic requirements, including those related to growth, necessary for such production); 27–33

(surveying the importation of steel goods), 33–40 (explaining the effect of steel mill closures on

employment, revenue generation, and investment), 41–46 (analyzing the effect of steel

production stagnation on the availability of facilities and research relevant to national security

needs).  See also Pl. Br. at Ex. D (the Secretary of Defense's assessment of certain Section

1862(d) factors).  Proclamation Nos. 9705 and 9711 likewise recite findings in terms of the

Section 1862(d) factors.  See Proclamation No. 9705, 83 Fed. Reg. at 11,625, ¶2 (reciting to the

Secretary of Commerce's findings with reference to Section 1862(d)), 11,626, ¶5 (concurring in

the Secretary's findings), 11,626, ¶8 (recounting factors considered), 11,626, ¶10 (explaining

exemptions for Canada and Mexico with reference to Section 1862(d)); Proclamation No. 9711,

83 Fed. Reg. at 13,361, ¶2 (referring to the relevant paragraphs of Proclamation No. 9705),

13,361–62, ¶5–9 (explaining the U.S. "security relationship" with each of the exempted

countries).  The latter Section 1862(d) factors are economic in nature.  The language therein is

quite broad and permissive, and apparently not limited to production necessary for national

defense purposes.[14]  Plaintiffs have pointed to neither statutory authority nor legislative history

which suggest that Section 1862(d) clearly forecloses the President from finding a threat to

national security due to the overall economic situation of the steel industry.  Where, as here, an

industry is found to produce goods vital to U.S. national security, see Steel Report at 23–26, the

court finds it highly unlikely that Presidential statements indicating an overarching economic

rationale for Section 1862 tariffs are clearly inconsistent with that statute's grant of authority.

Section 1862(d) furthermore requires consideration of "other relevant factors."  The

aforementioned statements regarding renegotiations of NAFTA, a trade agreement with two of

the United States' largest foreign steel sources, are not wholly unrelated to the factors listed in

Section 1862(d).  Assuming arguendo that these types of statements could affect the analysis, the

---

[14] Defendants are wrong, however, that "Congress has never attempted to narrow the President's Section [1862] authority."  Def. Br. at 31.  Prior to Proclamation No. 9705, Section 1862 had only been used to adjust imports of oil.  See, e.g., Proclamation No. 3279, 24 Fed. Reg. 1,781 (Mar. 12, 1959); Proclamation No. 3290, 24 Fed. Reg. 3,527 (May 2, 1959); Proclamation No. 3693, 30 Fed. Reg. 15,459 (Dec. 16, 1965); Proclamation No. 3794, 32 Fed. Reg. 10,547 (July 19, 1967); Proclamation No. 4543, 42 Fed. Reg. 64,849 (Dec. 27, 1977).  In 1980, Commerce specifically added a legislative override for oil-related action taken under this section.  Crude Oil Windfall Profit Tax Act of 1980, Pub. L. No. 96-223, 94 Stat. 229, § 402.  At minimum, this suggests that prior Presidential action under Section 1862 gave Congress reason to believe such an override might be desirable.  Since this amendment, Section 1862 has been invoked rarely.  Proclamation No. 4744, 45 Fed. Reg. 22,864 (Apr. 2, 1980); Proclamation No. 4748, 45 Fed. Reg. 25,371 (Apr. 11, 1980); Proclamation No. 4762, 45 Fed. Reg. 39,237 (June 6, 1980); Proclamation No. 4766, 45 Fed. Reg. 41,899 (June 19, 1980); Proclamation No. 4907, 47 Fed.

(continued . . . )

court does not find such statements sufficient on their own to underpin a credible case that the

President has clearly misconstrued his authority under Section 1862.   Accordingly, plaintiffs'

likelihood of success on the merits is very low.

###   III. Whether the Balance of Hardships Favors Plaintiffs

Regarding the balance of hardships, plaintiffs simply argue that the hardships described

above "far outweigh the Defendants' interests in enforcing an unlawful Steel Proclamation."  Pl.

Br. at 23.   It is almost impossible to analyze the harm to the Government of halting the tariffs, if

the merits of the tariffs are not reviewable.   Thus, without addressing the balance of hardships

specifically, defendants cite an immigration case for the proposition that the balance of hardships

and public interest "merge when the Government is the opposing party."   Def. Br. at 40 (citing

Nken v. Holder, 556 U.S. 418, 435 (2009)).   The Federal Circuit has not, however, adopted this

approach in subsequent trade cases.   Am. Signature, Inc. v. United States, 598 F.3d 816, 829–30

(Fed. Cir. 2010).   Defendants go on to analogize a tariff injunction in this case, to enjoining the

Navy from conducting training exercises.   Def. Br. at 40–41 (citing Winter v. Nat. Res. Def.

Council, 555 U.S. 7 (2008)).   First security for a stay is required.   See U.S. Ct. Int. Trade Rule

65(c).   Second, temporary lifting of some tariffs intended to have some economic effects down

the road is not the same as causing disruption and expense in connection with exercises directly

linked to national defense; at most, the United States would be harmed by a delay.   Qingdao

Taifa, 581 F.3d at 1382.   On the other hand, as described above, if plaintiffs are ultimately

successful, but no injunction is provided, they will suffer at least some degree of irreparable

---

Reg. 10,507 (Mar. 10, 1982); Proclamation No. 5141, 48 Fed. Reg. 56,929 (Dec. 22, 1983).

harm.  The balance of hardships likely favors plaintiffs.

### IV. Whether the Public Interest would be Served by Granting a Preliminary Injunction

Finally, plaintiffs contend that the remedying of constitutional violations and ensuring the President's compliance with the law always serves the public interest.  Pl. Br. at 23–24.  See Am. Signature, 598 F.3d at 830 ("The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly.").  Defendants contend that permitting Commerce to collect the tariffs serves the public interest because it is in the interest of national security.  Def. Br. at 41–43 (citing Goldman v. Weinberger, 475 U.S. 503, 507 (1986)).  Both the rule of law and our nation's security are foundational to the public good.  The court concludes that this factor favors neither party more than the other.

In sum, the court finds that plaintiffs have made a showing, but not a particularly strong showing, of irreparable harm.  The degree of potential harm is thus insufficient to overcome plaintiffs' low likelihood of success on the merits.  The balance of hardships and public interest are insufficiently weighted in plaintiffs' favor to overcome the deficiencies in the first two factors, which are central to the court's analysis.  Therefore, a preliminary injunction will not issue.

**PUBLIC VERSION**

Court No. 18-00057                                                                                    Page 25

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is **DENIED**.  The parties will proceed to

further brief the Government's motion to dismiss according to the Rules of the Court.


                                                            /s/ Jane A. Restani
                                                          Jane A. Restani, Judge

Dated: April 5, 2018
        New York, New York